# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:

)
The Use of a Cell-Site Simulator to Locate the Cellular )
Device Assigned Call Number 401-408-5846 )    Case No.  19-MJ-1273
)
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

The application is based on these facts: See Affidavit in Support of an Application for a Search Warrant. To ensure technical compliance with the Pen Register Statute, 18 U.S.C. §§ 3121-3127, this warrant also functions as a pen register order. Consistent with the requirement for an application for a pen register order, I certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by [investigative agency].

☒ Delayed notice of  30  days (give exact ending date if more than 30 days:_____ ) is requested
    under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Mario F. Gonzales  Assistant United States Attorney
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date:  6/25/19

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

William E. Duffin , U.S. Magistrate Judge
*Printed Name and Title*

AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT

I, Aaron Busche, being first duly sworn, hereby depose and state as follows:

INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) to authorize law enforcement to employ an electronic investigative technique, which is described in Attachment B, to determine the location of the cellular device assigned call number **(401) 408-5846**, with listed no listed but currently used by Soudchai VISETHSOUNETHON, aka "Chino" ("**TARGET CELL PHONE D**"), whose service provider is **VERIZON WIRELESS**, a wireless telephone service provider headquartered in Bedminster, NJ.  The **TARGET CELL PHONE D** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127.  The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3.      I am employed as a Detective with the Greenfield Police Department and have been a law enforcement officer for over 10 years.  I have been a Detective for over 4 years and have been assigned to the High Intensity Drug Trafficking Area (HIDTA) for over 4 years.   I am also a Task Force Officer with the United States Department of Justice, Drug Enforcement Administration (DEA), and have been since March, 2015.  As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United

States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

4.  I have participated in numerous complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses. I have had both formal training and have participated in numerous complex drug trafficking investigations, including ones using wiretaps. More specifically, my training and experience includes the following:

a.  I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

b.  I have also relied upon informants to obtain controlled substances from dealers, and have made undercover purchases of controlled substances;

c.  I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

d.  I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

e.  I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

f.  I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations;

g.  I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

h.      I have been assigned to court-authorized wiretaps and have been trained to operate the equipment utilized to conduct such operations;

i.      I know that drug traffickers often put their telephones in nominee names in order to distance themselves from telephones that are utilized to facilitate drug trafficking; and

j.      I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets in order to avoid scrutiny from law enforcement officials.

5.      I am currently participating in an investigation of a fentanyl, heroin, methamphetamine, and marijuana trafficking organization led by Jonnie LOPEZ, hereinafter referred to as the LOPEZ DTO. I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers, all of whom I believe to be truthful and reliable; and (c) information obtained from cooperating citizen witnesses, confidential sources, and defendants, whose reliability is established herein.[1] This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Throughout this affidavit, reference will be made to case agents or investigators. Case agents or investigators are those federal, state, and local law

---

[1] Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

enforcement officers who have directly participated in this investigation, and with whom your Affiant has had regular contact regarding this investigation.

7.    Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841 and 846, and Title 18, United States Code, Sections 1956 and 1957, have been committed, are being committed, and will be committed by an Jonnie LOPEZ, Pedro MENDOZA, Soudchai VISETHSOUNETHON and others not yet identified. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

8.    The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

9.    During March 2018, a confidential source herein referred to "CS-1"[3] was interviewed and provided information about a heroin dealer by the name of Johnny GLOVER. CS-1 was shown a Wisconsin DOT photograph of Johnny C. GLOVER (m/b 04-26-80)[4] and

---

[3] Case agents believe the CS-1 is a reliable person because the CS-1 has provided information which law enforcement has been able to corroborate through independent investigations, the CS-1 has provided statements against the CS-1's own penal interests, and the CS-1 has conducted controlled buys of narcotics for law enforcement.

[4] GLVOER has prior arrests for Delivery of Heroin, Delivery of a Schedule II Narcotic, Operating while Revoked, Operating While Under the Influence, Possession with the Intent to Deliver Cocaine, Possession with Intent to Deliver Marijuana, Bail Jumping, Resisting and Obstructing an Officer, First Degree Reckless Endanger Safety, Possession of THC, Maintaining a Drug Tracking Place, Contributing to the Delinquency of a Child, Using a Child to Distribute Narcotics, Failure to Appear, and Loitering or Prowling.

positively identified the person as Johnny GLOVER (here in referred to GLOVER). Over the course of the next three months, North Central HIDTA and the DEA conducted three (3) controlled purchases of heroin, cocaine, and fentanyl from GLOVER.

10. On August 21, 2018 case agents conducted two search warrants and arrested GLOVER. Case agents recovered heroin, cocaine and a firearm during the arrest of GLOVER. A recorded and mirandized interview of GLOVER was conducted at the Greenfield Police Department by TFO Busche. GLOVER provided specific information about the drug trafficking activities of his source of supple, who he identified as Jonnie LOPEZ. A Wisconsin DOT photograph of Jonnie D. LOPEZ (m/w 06-12-85) was shown to GLOVER who positively identified Jonnie D. LOPEZ (m/w 06-12-85) his heroin and cocaine supplier.

11. GLOVER further stated during one purchase of narcotics he conducted with LOPEZ the narcotics were delivered by LOPEZ's half-sister, Samantha WEBSTER. A photograph of Samantha WEBSTER (f/w 06-13-90)[5] was shown to GLOVER and GLOVER positively identified WEBSTER as LOPEZ's half-sister. GLOVER indicated he has known LOPEZ for over 10 years and was aware LOPEZ's family is involved in assisting him in the distribution of heroin in the Milwaukee area. GLOVER is currently released from custody ($20,000 signature bond) and has since been charged in Milwaukee County Circuit Court, 2019CF001253, with Manufacturing and Delivery of Cocaine, Manufacturing and Delivery of Cocaine. Manufacturing and Delivery of Cocaine. Manufacturing and Delivery of Schedule II narcotic, and Manufacturing and Delivery of Heroin.

---

[5] WEBSTER has prior arrests for Aggravated Battery/Intent Great Bodily Harm, Disorderly Conduct, Criminal Damage to Property, Battery, and Possession of Marijuana.

12.    Case agents started an investigating into the LOPEZ DTO for the sale and distribution of heroin in August of 2018. Case agent were able to positively identify members of the LOPEZ DTO through phone tolls analysis, surveillance, controlled deliveries of narcotics and surveillance of LOPEZ.

13.    On November 2nd, 2018 in the City of Cudahy at 5529 S. Illinois Avenue, Cudahy WI 53110 squads responded for a report of a heroin overdose (City of Cudahy Police Department case 18-001987). It was believed Brian KESSLER died as a result of ingesting heroin obtained from Tina HERMANN. On 12-12-18, Milwaukee Medical Examiner report was received. The report indicated KESSLER died of an "acute mixed ethanol and heroin toxicity". Tina HERMANN was arrested and provided information that the fatal heroin Tina HERMANN provided to the victim was obtained directly from Jonnie LOPEZ (25 grams). The Milwaukee County District Attorney is currently reviewing charges for Reckless Homicide against LOPEZ. Tina HERMANN is currently in custody at the Milwaukee County Criminal Justice Facility and has been charged for Manufacturing and Delivery of Heroin (PTAC) and Possess with the Intent to Deliver Heroin (PTAC), Milwaukee County Circuit Court Case Number 2019CF005296.

14.    On Tuesday, April 25, 2019, case agents met with a confidential source, here in after referred to as "CS-2."[6]    CS-2 provided information regarding suspects involved in drug trafficking in the Milwaukee, Wisconsin, area. CS-2 identified Jonnie LOPEZ aka "Jonnie" and "J-Money" as a large-scale distributor of heroin, cocaine, methamphetamine and marijuana in the greater Milwaukee area. CS-2 stated "Jonnie" is a Hispanic male, approximately 5'8", 150 lbs.,

---

[6] Case agents believe the CS-2 is a reliable person because the CS-2 has provided information which law enforcement has been able to corroborate through independent investigations, the CS-2 has provided statements against the CS-2's own penal interests, and the CS-2 has conducted controlled buys of narcotics for law enforcement.

33-35 years old, and lives at a residence (duplex) on E. Windsor place in the City of Milwaukee. Investigators identified "Jonnie's" residence as 1817 E. Windsor Place. CS-2 stated he/she has known "Jonnie" for approximately six months and has conducted drug/money transactions from "Jonnie" in the past. CS-2 stated "Jonnie" drives a black Jeep Wrangler, and a grey Chrysler sedan.

15.     CS-2 further stated on or around the first week of April, CS-2 was at "Jonnie's" residence (1817 E. Windsor Place, Milwaukee, WI), and observed a large quantity of heroin, cocaine, and methamphetamine. CS-2 believes "Jonnie" deals directly with a yet unknown source of supply in Mexico. CS-2 stated "Jonnie" sends money down to Mexico, which covers transportation costs, as well as the quantity of narcotics being transported.

16.     During the week of April 29, 2019, CS-2 was in telephonic contact with "Jonnie". CS-2 stated at this time, "Jonnie" said he was expecting a big load (of narcotics) in the next week or so. CS-2 estimates that "Jonnie" was referring to kilogram quantities of cocaine, and/or heroin, and methamphetamine. CS-2 provided two telephone numbers for "Jonnie"; (414) 306-2769, and (414) 241-4274.

17.     On May 2nd, 2019, CS-2 was shown a Wisconsin DOT photograph Jonnie D. LOPEZ (m/w 06-12-85) and positively identified Jonnie D. LOPEZ (m/w 06-12-85) as the heroin, cocaine, methamphetamine and marijuana dealer CS-2 knows at "Jonnie".

18.     Case agents conducted a records check through NCIC of Jonnie LOPEZ, which showed LOPEZ is currently on Federal Probation for the Sale and Distribution of Marijuana in Eastern District of Wisconsin, DEA case I3-11-0051 (Sentenced 60 months, 3 years supervised release).

19.     In the end of May 2019, CS-2 was interviewed and provided additional information about LOPEZ. CS-2 recorded a conversation CS-2 had with LOPEZ. LOPEZ informed CS-2,

"they got here. **Chino** got some." LOPEZ told CS-2 altogether I have 52 of water." (TFO Busche

clarified with the CS-2 that 'water' is a term used about Methamphetamine). LOPEZ further

clarified and said he had "10 here right now." LOPEZ told CS-2 while "Pedro" was "here talking

to me, his dad called and said he had 42 more" for LOPEZ. LOPEZ said once the "10" are gone

"he" (Pedro) would transport "the Chinatown" and the "42" back.

20.      LOPEZ told CS-2 that LOPEZ was "getting them for 3." (Case agents believed this

to mean LOPEZ was paying $3000 for 1 pound of the crystal methamphetamine). LOPEZ told

CS-2 he was hoping to get a cut in the price of the crystal methamphetamine once he was done

with the CS-2, 10 pounds and was going to get the 42 pounds of methamphetamine. LOPEZ told

CS-2 the "42 pounds" of crystal methamphetamine was going to be "coming the same time with

the food." LOPEZ told CS-2 it "was already across the border. It's already there so it's for sure.

100% locked in already." LOPEZ said "he (who case agents believed was "Pedro") has to go back

and then he's going to grab everything and come right back." LOPEZ reiterated to CS-2 the "10"

needed to be sold first.

21.      LOPEZ told CS-2 "**Chino**" has "10" (case agents believed this to indicate "**Chino**"

was holding onto the 10 pounds of crystal methamphetamine LOPEZ received from "Pedro").

22.      LOPEZ said the next time "Pedro was here, he is going to bring me one 'girl'

(which case agents believed to be one kilogram of cocaine) and if we like it he's going to get us

10 more right away. And we will be getting the girl for 29 ($29,000)."

23.      Later in the conversation, LOPEZ told CS-2 his connect (which case agents know

to be a slang term about a narcotic distributor's source of supply) uncle was going to purchase a

vehicle from "**Chino**."

24.     LOPEZ then told CS-2 he was to receive "10 of the chocolate." (Case agents learned "chocolate" is a slang term for heroin). LOPEZ told CS-2 he was paying "25" ($25,000) for a kilogram of heroin. LOPEZ indicated he would receive 7 kilograms of heroin and was going to increase the amount of 10 kilograms of heroin by adding a cutting agent to the 7 kilograms of heroin. LOPEZ described how this process was going to increase the "profit" LOPEZ and CS-2 would see from distributing these narcotics.

25.     Case agents further spoke with CS-2 regarding a more recent meeting between CS-2 and LOPEZ. CS-2 stated they learned and believed LOPEZ's sister (Samantha WEBSTER) was in California waiting for word from LOPEZ that he had sold the 10 pounds of crystal methamphetamine and could drive the next shipment of narcotics back to Wisconsin. CS-2 also provided an updated phone number for LOPEZ of **262-389-5239**.

26.     CS-2 stated CS-2 had observed a white Dodge Challenger near the area of LOPEZ's residence. The vehicle displayed California license plate 8JBK998. A search of the California Department of Transportation revealed the following information:     8JBK998, CA/Auto Registration, VIN: 2C3CDZBT1HH548937. 2017 Dodge BTM, 2-Door  the registered owner was listed as Pedro MENDOZA, Jr, DOB: 06-28-1993, 450 E. 4th St, Apt. 432, Santa Ana, CA 92701.

27.     TFO Busche obtained a California Department Transportation photograph of MENDOZA, Jr, and displayed this photograph to CS-2 who positively identified this subject as "Pedro". Based on the conversation the CS-2 had with LOPEZ and the context in which LOPEZ referenced and talked about Pedro, TFO Busche believed MENDOZA Jr. is LOPEZ's narcotics source of supply to include heroin, cocaine and methenamine.

28.     On May 29th, 2019, case agents met with a CS-2 at a predetermined meeting location. The day prior to meeting with CS-2, CS-2 informed case agents CS-2 contacted a subject

CS-2 I knew as "**Chino**" and arranged to purchase a quantity of methamphetamine from "**Chino**" the following day. CS-2 informed case agents when CS-2 spoke with "**Chino**" the CI was told they would meet in the area of S. 30th Street and W. Lincoln Avenue.

29.     Case agents searched CS-2 at the predetermined meeting location for any weapons, US currency and controlled substances with negative results. Case agents also searched the vehicle operated by CS-2 for weapons, US currency and controlled substances with negative results. Once CS-2 and CS-2's vehicle was searched, case agents had CS-2 contact "**Chino**" through text messaging with (401) 443-0447, to confirm the meeting location to conduct the controlled buy of methamphetamine. CS-2 was equipped with a covert audio only transmitter/recorder as well as a covert video recorder. Case agents elected to depart the predetermined meeting location and began traveling to the buy location.

30.     While enroute to the controlled buy location, DEA Group 63 Task Force Officer (TFO) Aaron Busche overheard CS-2 receive a FaceTime call. During the conversation, TFO Busche overheard CS-2 say, "He's calling me now." (CS-2 later told TFO Busche during the FaceTime conversation with LOPEZ, CS-2 received a FaceTime call from "**Chino**" at (401) 443-0447. CS-2 ended the conversation with LOPEZ and spoke with "**Chino**." "**Chino**" told CS-2 his phone died, and he attached it to a charger. "**Chino**" and CS-2 discussed a meeting location and decided on meeting near the area of S. 30th Street and W. Lincoln Avenue. "**Chino**" told CS-2 to meet at the "gas station."

31.     Surveillance units were deployed in the area and indicated there was a gas station on the southeast corner of the intersection of S. 30th Street and W. Lincoln Avenue. CS-2 was directed to park in the parking lot of the gas station. At approximately 11:00 a.m., TFO Evelyn Lazo observed a "lifted" white Chevrolet Silverado pick-up truck enter the gas station parking lot.

The vehicle displayed Tennessee dealer registration plate 34404D. TFO Lazo observed a Hispanic male exit the driver door of the Silverado. The Hispanic male was carrying a black "convenience store" bag and was wearing a black and white striped shirt and black pants. TFO Lazo observed this subject walk to CS-2's vehicle and enter the passenger door. (CS-2would later confirm the subject as the subject CS-2 knew as "**Chino**"). Approximately one minute later "**Chino**" exited the passenger side of the CS-2's vehicle and returned to the driver door of the pick-up truck.

32.     City of Waukesha Investigative Specialist (SPC) Tim Filter and TFO Busche met with CS-2 at a pre-determined meeting location. SPC Filter searched CS-2 for any weapons, controlled substances and US Currency with negative results. TFO Busche retrieved the covert audio and video recording devices as well as a black "convenience store bag" from the front passenger seat of the CS-2's vehicle which contained 454 grams of methamphetamine. TFO Busche, as witnessed by TFO Plennes, subjected a sample of methamphetamine to the Nark II, #01 Marquis Reagent test and received a positive result for the presence of methamphetamine.

33.     Case agents conducted a records check through the Department of Transportation for the State of Tennessee. The records showed the license plate for 34404D had a registered owner of Nashville Carz Automotive - **3414 Old Hickory Blvd, Old hickory TN 37138**.

34.     On June 11, 2019, CS-2 meet with LOPEZ at his residence, 740 W. Wisconsin Ave, Milwaukee. CS-2 stated while inside LOPEZ's apartment, LOPEZ obtained a clear plastic bag containing a kilogram of heroin. LOPEZ advised CS-2 that he had ordered 4 more kilograms of heroin and 5 kilograms of fentanyl from his source of supply in California. The 9 kilograms were currently waiting for him in California. During the conversation LOPEZ stated his sister, Samantha WEBSTER's vehicle broke down and LOPEZ had to send his people out to help her get

back to Wisconsin, who case agent believe was "**Chino**". LOPEZ confirmed the vehicle the narcotics were returned in was a BMW.

35.     During this meeting surveillance units observed a 2017 white Dodge Challenger arrive at the address 740 W. Wisconsin Ave. Surveillance units positively identified the driver of the vehicle as Pedro MENDOZA.

36.     CS-2 stated that Pedro MENDOZA arrived at LOPEZ's apartment wearing a gray shirt and shorts. CS-2 stated he/she has met MENDOZA before and stated MENDOZA is LOPEZ's source of supply. CS-2 stated that LOPEZ told MENDOZA that he needed to call his father and find out where the narcotics are. CS-2 stated that he could hear LOPEZ and MENDOZA counting money in LOPEZ 's bedroom and CS-2 left the residence

37.     Additionally, case agents observed a white Penske box truck in the parking lot of LOPEZ's apartment. The Penske box truck had a car hauler attached to the rear. The box truck displayed Indiana Registration plate 2863399; the car hauler displayed Indiana Registration plate P495595. TFO Busche observed a dark colored BMW parked in the underground parking space assigned to apartment 228 (spot #2) and this vehicle displayed California registration plate 5SXG427.

38.     Case agents submitted a subpoena to Penske truck rental and on 06-12-19 received a return from Penske legal department, Janice Kloc, Penske Truck Paralegal. The Rental Agreement was in the name of "Peter Delre", **3414 Old Hickory Blvd, Old Hickory, TN 37138** and a listed phone number of **(401) 602-6385**. The rental agreement detailed "Peter Delre" driver license as 830192537 (Tennessee) and a date of birth of 07-14-1971.

39.     Case agents noted the rental agreement was the same address for the dealer plates displayed on "**Chino**'s" vehicle that was used to transport 454 grams of methamphetamine on 05-

29-19.  Furthermore, case agents believed the Penske rental vehicle and the BMW were used to transport narcotics from California to Wisconsin.

40.     On or around June 14th, 2019, CS-2 met with LOPEZ at LOPEZ's residence. During this meeting, CS-2 indicated LOPEZ, MENDOZA and "Chino" were at LOPEZ's residence at different points during the time CS-2 was at the residence. CS-2 indicated LOPEZ stated his sister (believed to be Samantha WEBSTER) was already in California and MENDOZA and "Chino" were going to be flying out to meet her. CS-2 stated once WEBSTER, MENDOZA and "Chino" had all the narcotics together, they would begin driving the narcotics back to Wisconsin. CS-2 stated "Chino," would be in touch with CS-2 at a later time.

41.     On Monday June 17th, 2019 case agents conducted a search of several law enforcement databases and were able to identify "Chino" as Soudchai VISETHSOUNETHON, w/m, DOB 09-20-1980; CS-2 viewed a Wisconsin Department of Transportation photo of VISETHSOUNETHON and positively identified VISETHSOUNETHON as "Chino."

42.     On June 21st, 2019, CS-2 was in contact with VISETHSOUNETHON and VISETHSOUNETHON provided CS-2[7] a phone number of **(408) 408-5846 (TARGET CELL PHONE D)**.

43.     On June 21st, 2019, TFO Busche conducted a check of **TARGET CELL PHONE D** on an internet database and learned the phone belonged to **VERIZON WIRELESS** and there

---

[7] Case agents have learned, and reasonably believe, CS-2 may still be actively involved in the distribution of narcotics. During the week of June 17th, 2019, case agents received information that a Milwaukee area heroin distributor identified CS-2 as their source of heroin. Case agents cannot, at this time, determine whether or not CS-2 is distributing heroin they obtained from Jonnie LOPEZ or from other sources. While this knowledge is concerning for case agents, case agents believe the information being received from CS-2 in regard to the ongoing criminal activity of the LOPEZ DTO is accurate since case agents have been able to independently corroborate information previously and currently being provided by CS-2.

was no specific subscriber information. TFO Busche submitted an administrative subpoena upon **VERIZON WIRELESS** which confirmed there was no subscriber information on the account.

44.     On June 24th, 2019, TFO Busche conducted toll analysis of **TARGET CELL PHONE D**. The toll analysis is brief since the cell phone number was established on June 16th, 2019 and the number of incoming and outgoing phone calls is limited. The toll analysis revealed a significant number of common callers in contact between **TARGET CELL PHONE D** and prior toll records case agents had obtained for numbers previously used by VISETHSOUNETHON. **TARGET CELL PHONE D** is in contact with the number case agents know to be used by LOPEZ and was most recently in contact with LOPEZ **(262) 389-5239** in the morning hours of June 24th, 2019

45.     One purpose of applying for this warrant is to determine with precision the location of **TARGET CELL PHONE D.** However, there is reason to believe the Target Cellular Device is currently located somewhere within this district because of the location information being provided by **VERIZON WIRELESS**.

## **MANNER OF EXECUTION**

46.     In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

47.     To facilitate execution of this warrant, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by **TARGET CELL PHONE D** or receiving signals from nearby cellular devices, including the **TARGET CELL**

**PHONE D**. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to **TARGET CELL PHONE D** and thereby prompt it to send signals that include the unique identifier of the device. Law enforcement may monitor the signals broadcast by **TARGET CELL PHONE D** and use that information to determine **TARGET CELL PHONE D's** location, even if it is located inside a house, apartment, or other building.

48. The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In order to connect with the **TARGET CELL PHONE D**, the device may briefly exchange signals with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be the **TARGET CELL PHONE D**, and law enforcement will limit collection of information from devices other than the **TARGET CELL PHONE D** . To the extent that any information from a cellular device other than the **TARGET CELL PHONE D** is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing **TARGET CELL PHONE D** from all other cellular devices.

<u>AUTHORIZATION REQUEST</u>

49. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41. The proposed warrant also will function as a pen register order under 18 U.S.C. § 3123.

50. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **TARGET CELL PHONE D** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

51. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **TARGET CELL PHONE D** outside of daytime hours.

52. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

Respectfully submitted,

_____
AARON BUSCHE
Task Force Officer
DEA

Subscribed and sworn to before me
On: __6/25/19_____

_____
WILLIAM E. DUFFIN
United States Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

1. This warrant authorizes the use of the electronic investigative technique described in Attachment B to identify the location of the cellular device assigned call number **(401) 408-5846**, with no listed subscriber but currently believed to be used by Soudchai VISETHSOUNETHON aka 'Chino' (**"TARGET CELL PHONE D"**), whose wireless communications service provider is **VERIZON WIRELESS**, a wireless telephone service provider headquartered in Bedminster, NJ.

## ATTACHMENT B

### Particular Things to be Seized

Pursuant to an investigation of Jonnie LOPEZ, Pedro MENDOZA and others known, and yet to be known, for a violation of Conspiracy to Distribute heroin, fentanyl, methamphetamine and marijuana, this Warrant authorizes the officers to whom it is directed to determine the location of the cellular device identified in Attachment A by collecting and examining:

1. radio signals emitted by the target cellular device for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and

2. radio signals emitted by the target cellular device in response to radio signals sent to the cellular device by the officers;

for a period of thirty days, during all times of day and night. This warrant does not authorize the interception of any telephone calls, text messages, other electronic communications, and this warrant prohibits the seizure of any tangible property. The Court finds reasonable necessity for the use of the technique authorized above. *See* 18 U.S.C. § 3103a(b)(2).

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 846 and 841(a)(1) (conspiracy to distribute a controlled substance and distribution of a controlled substance) involving Johnny LOPEZ, "Chino" and others.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are

authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.